## BROWN *v.* THE STATE.

The evidence was sufficient to authorize the jury to find the defendant guilty, no errors of law were committed, and the judge did not abuse his discretion in refusing a new trial:

Argued April 20,—Decided May 13, 1908.

Indictment for murder. Before Judge Felton. Bibb superior court. May 13, 1908.

*John R. Cooper,* for plaintiff in error.

*John C. Hart, attorney-general,* and *William Brunson, solicitor-general,* contra.

HOLDEN, J. ˙ According to the evidence in this case, the deceased was mortally wounded in the early hours of the morning, by some one who fired upon him through a window located by the side of the bed in which the deceased was at the time sleeping with a woman by the name of Jennie Chappell. He was taken to the city hospital shortly after being wounded, and, fifteen minutes after reaching there, signed a written declaration, in which he stated that he was shot by a person named Brown, who was a fireman on the Central Railroad. He had previously stated to an officer who was called to the scene of the crime that he was shot by Brown,—that the latter was the only man who could have done it. Deceased told this officer "the only trouble there was that morning Brown was there and said every dog has his day, and turned around and left." The officer further testified: "He [deceased] gave no reasons only what I said why he suspected Brown—he said every dog would have his day that morning and he would have his before daylight." The crime occurred on a dark, cloudy, and rainy night, and it is apparent, from all the testimony and circumstances adduced on the trial, that the deceased was asleep when fired upon, and probably did not see the person who shot him, but based his statement, that it was done by Brown, upon suspicion engendered by threats which the accused had made. Jennie Chappell testified that when the deceased was shot he jumped up, and the first thing he said was

that Oliver Brown had shot him. It further appeared, from her testimony, that she had been sleeping with the deceased for about two months, and that she had also at one time been intimate with the accused. She testified that the accused came to her house (in which the crime occurred) on Sunday morning, and Monday night immediately preceding the killing, and on each occasion, upon her refusal to go on the porch and talk with him, had said "every dog has his day." He came to her house again on Tuesday morning, and upon her again refusing to talk with him and telling him she did not want any "fuss," he stated that he was going to get even with her. The crime was committed the night following this threat. After its commission, and on the same night it occurred, two police officers went to the home of the accused and asked him where his shotgun was; to which question he replied that he had not had one in two years. They then asked him for his pistol, which he got from a rubber coat hanging on a chair and handed them. The accused was undressed when the officers went to his house. One of the officers testified that he examined the shoes belonging to the accused, that they had been worn recently, were damp, and had wet dirt all over them. They carried him to a "box," and when the patrol wagon came for him he was searched and a shotgun shell found in his pocket; upon the discovery of which the accused, according to the testimony of one of the officers, "sorter sunk to his knees, and that was the first time I saw him give way." They then again asked him where his shotgun was; to which he again replied that he had not had one for two years. The officers then immediately returned to the home of the accused and discovered a shotgun hidden under the mattress of the bed in which he slept. According to the testimony of the officers, one barrel of the gun contained a loaded shell and the other barrel was empty. The empty barrel blackened the finger when inserted in it, and smelled like freshly burned powder, while the other barrel was clean and dry. The shell taken from the pocket of the accused was like the one contained in the loaded barrel of the gun. The accused lived about half a block from the scene of the crime. Upon the trial he made a statement in which he denied any knowledge of the killing and claimed that he had been at home asleep all night, but he gave no explanation as to the possession of the shotgun found in his bed, or with

respect to the other incriminating circumstances proved against him.

Disregarding the declarations made by the deceased, as being of no probative value, the conviction of the accused rested entirely on circumstantial evidence; and while it is not of a very strong character, yet, taken as a whole, it can not be said that there were not sufficient facts and circumstances proved to warrant the jury in arriving at the conclusion that the defendant was guilty. No errors of law were committed on the trial of the case, and the judgment of the court below in refusing a new trial is

*Affirmed. All the Justices concur.*